UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------ x

JOSEPH FAMOSO.,                  :

                                    :

               Plaintiff,        :                **OPINION AND ORDER**

                                    :          12-cv-4863 (DLI)(VVP)

                                    :

            -against-         :

                                    :

                                    :

MARSHALLS OF MA, INC. and THE TJX:
COMPANIES, INC.,              :

                                    :

              Defendants.      :

------------------------------------------------------------ x

**DORA L. IRIZARRY, U.S. District Judge:**

      After filing charges of age discrimination with the United States Equal Employment Opportunity Commission, Plaintiff Joseph Famoso ("Plaintiff") commenced the instant action in New York State Supreme Court, Kings County, against Defendants Marshalls of MA, Inc. ("Marshalls" or the "Company") and The TJX Companies, Inc. ("TJX") (collectively, "Defendants"), alleging employment discrimination on the basis of his age in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et. seq.*, and the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8-107. (*See* Complaint ("Compl."), Ex. B to the Notice of Removal, Dkt. Entry No. 1.) Defendants removed the action to this Court, and now move for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. (*See* Defs.' Mem. In Supp. of Mot. For Summ. Judgment. ("Defs.' Mem."), Dkt. Entry No. 37-1.) Plaintiff opposes. (*See* Pl.'s Mem. in Opp. to Defs.' Mot. for Summ. Judgment ("Pl.'s Opp'n"), Dkt. Entry No. 37-9.) For the reasons that follow, Defendants' motion for summary judgment is granted and this action is dismissed in its entirety.

# BACKGROUND[1]

## I.      The Parties and Relevant Non-Parties

Marshalls, a subsidiary of TJX, is a nationwide retailer of family apparel, housewares, and other merchandise, with approximately 900 retail outlets across the United States, including Store 694 ("Store 694" or the "Store") located at the Atlantic Center in Brooklyn, New York. (Defs.' Rule 56.1 Statement of Material Facts ("Defs.' 56.1") ¶ 1, Dkt. Entry No. 37-2; Pl.'s Rule 56.1 Counter-Statement of Material Facts ("Pl.'s 56.1 Resp.") ¶ 1, Dkt Entry No. 37-10.) Plaintiff was hired by Marshalls in October 2008, at the age of 61, to serve as manager of Store 694, a position he remained in until his termination in April 2011 at the age of 63. (Defs.' 56.1 ¶¶ 8-9, 158; Pl.'s 56.1 Resp. ¶¶ 8-9, 158.)

As part of the hiring process, Plaintiff was interviewed by Michael Connell ("Mr. Connell"), then the Regional Vice President of Marshalls, and by Rodney Gable ("Mr. Gable"), a District Manager who was Plaintiff's immediate supervisor between October 2008 and April 2010.[2] (Defs.' 56.1 ¶¶ 10-13; Pl.'s 56.1 Resp. ¶¶ 10-13.) Jacqueline Jean-Francois ("Ms. Jean-Francois") replaced Mr. Gable as Plaintiff's District Manager and immediate supervisor in April 2010, when she was 44 years old, and served in that role for the remainder of Plaintiff's employment. (Defs.' 56.1 ¶¶ 14-15; Pl.'s 56.1 Resp. ¶¶ 14-15.)

## II.     Plaintiff's Managerial Responsibilities and Store Policies

As manager, Plaintiff was responsible for the overall operation of Store 694, including sales, operational and merchandising controls, scheduling, and customer service. (Defs.' 56.1 ¶ 16; Pl.'s 56.1 Resp. ¶ 16.) Per Company policy, Plaintiff was required to operate his Store in

---

[1]  The following facts are undisputed unless otherwise noted.

[2]  Plaintiff alleges that he was hired by Mr. Gable, not Mr. Connell, but does not dispute that Mr. Connell interviewed him during the hiring process and approved the hiring. (*See* Defs.' 56.1 ¶ 10; Pl.'s 56.1 Resp. ¶ 10.)

accordance with certain procedures and standards developed by Marshalls. (*See* Defs.' 56.1 ¶¶ 18-24, 26-27; Pl.'s 56.1 Resp. ¶¶ 18-24, 26-27.)

First, Marshalls disseminated to its managers, including Plaintiff, "Best Methods" procedures they were required to follow for unloading trucks, breaking down and displaying merchandise, scheduling employee shifts, and other similar tasks. (*See* Defs.' 56.1 ¶¶ 21-22; Pl.'s 56.1 Resp. ¶¶ 21-22; *see also* Tr. of Dep. of Joseph Famoso ("Pl. Dep.") 124:6-125:12, Ex. A. to the Kesselman Decl., Dkt. Entry No. 37-4.) Plaintiff knew that he would be evaluated based upon his adherence to Best Methods. (*See* Defs.' 56.1 ¶ 23; Pl.'s 56.1 Resp. ¶ 23.) Second, Marshalls distributed "Door-to-Floor" standards for moving merchandise from delivery trucks to the sales floor. (Defs.' 56.1 ¶¶ 26-27; Pl.'s. 56.1 Resp. ¶¶ 26-27; *see also* Pl. Dep. 137:3-140:21.)

These policies were intended, in part, to minimize factors likely to contribute to lost value. (*See, e.g.,* Defs.' 56.1 ¶¶ 30, 32.[3]) One such factor is "shrink," a metric measuring the lost value of merchandise due to theft, damages, and/or operational errors. (Defs.' 56.1 ¶ 28; Pl.'s 56.1 Resp. ¶ 28.) Another factor is "damages," which describes the lost value of merchandise that cannot be sold, or must be sold at a reduced price, due to destruction or damage. (Defs.' 56.1 ¶ 31; Pl.'s 56.1 Resp. ¶ 31.) A third factor is "recovery," which refers to procedures for verifying that merchandise is properly tagged, displayed, and arranged with like items. (Defs.' 56.1 ¶ 33; Pl.'s 56.1 Resp. ¶ 33.)

---

[3] Plaintiff's Rule 56.1 Counter-Statement of Material Facts is replete with responses neither admitting nor controverting a fact asserted by Defendants, but instead merely objecting that the asserted fact is "argumentative" or "immaterial." Not responding to an assertion of fact in this manner is grounds for deeming the fact admitted. *See* Local Civil Rule 56.1(c); *see also Pape v. Bd. of Educ. Of Wappingers Cent. School Dist.,* 2013 WL 3929630, at *1 n.2 (S.D.N.Y. July 30, 2013 (collecting authority.) While the Court declines to deem as admitted all facts Plaintiff responds to in this manner, it will not view Plaintiff's non-responsiveness as creating, on its own, any issue of disputed material fact.

## III.    Plaintiff's Employee Performance Record

### A.    FY 2009 Performance Review

In April 2009, Plaintiff received his first formal performance review.  Covering Fiscal Year[4] ("FY") 2009, the review ("FY 2009 Review") gave Plaintiff good marks for exceeding expected sales goals and increasing sales compared to the prior year.[5]  (Defs.' 56.1 ¶ 42; Pl.'s 56.1 Resp. ¶ 42.)  However, the review noted a poor shrink rate of 5.75% at Store 694, versus a Company expectation of 3.9%.  (*See* Defs.' 56.1 ¶¶ 44-45; Pl.'s 56.1 Resp. ¶¶ 44-45; *see also* FY 2009 Review, Ex. K to the Decl. of Dov Kesselman ("Kesslman Decl."), Dkt. Entry No. 37-5.)  The review also indicated inconsistent recovery and Door-to-Floor procedures, though it noted improvement in the fourth quarter when Plaintiff took over as manager.  (*See* FY 2009 review.)  Other results reported in the review included shoe damages of $83,594, which represented a year-over-year increase of 585.5% against a chain-average increase of just 2.2%, as well as substandard results on an "LCA Audit" measuring compliance with shrink, operations, and human resources protocols.  (*See Id.*; *see also* Defs.' 56.1 ¶¶ 52-53.)

Based on the review criteria, Plaintiff received an overall score of 52.5/100 on his review, placing him in the "Meets Objectives" assessment category.  (*See* FY 2009 Review.)  Plaintiff acknowledged that he needed to improve Best Methods and recovery procedures at his Store,

---

[4]  Marshalls operates according to a Fiscal Year, which runs between February and the following January.  For example, Fiscal Year 2009 covered the period from February 1, 2008 through January 31, 2009.  (*See* Defs.' 56.1 ¶ 2; Pl.'s 56.1 Resp. ¶ 2.)

[5]  While Plaintiff "disputes" substantially all facts related to his performance reviews, he does not contest the actual scores he received or the underlying metrics.  Rather, he disputes only the fairness of Defendants' assessments based on his subjective belief that the review criteria, particularly compliance with Best Methods and Door-to-Floor procedures, were unfairly applied with respect to Store 694.  (*See* Pl.'s 56.1 Resp. ¶¶ 41-45, 211-246)  In his Rule 56.1 Counter-Statement of Material Facts, Plaintiff therefore repeatedly "disputes" or dismisses as immaterial numerous facts that either are confirmed by documentary evidence, or that he openly admitted at his deposition.  By "disputing" facts he admits are true, Plaintiff again frustrates the intended purpose of Local Civil Rule 56.1.  As such, the Court emphasizes once more that, absent competent evidence genuinely putting a fact in controversy, the Court will not construe Plaintiff's mere representation that a fact is "disputed" as creating any issue of material fact.

while better complying with applicable Door-to-Floor timeframes for moving delivered merchandise to the sales floor. (*See* Defs.' 56.1 ¶¶ 49, 56; Pl.'s 56.1 Resp. ¶¶ 49, 56; *see also* Pl. Dep. 177:7-18.)

Plaintiff nonetheless disputes the fairness of his FY 2009 Review, and all of his performance reviews in general, for several reasons. First, the FY 2009 Review covered a year in which Plaintiff managed Store 694 only for about three months. (*See* Pl.'s 56.1 Resp. ¶¶ 44-45, 53.) Second, Plaintiff contends that his Store was not provided with the necessary personnel and payroll budget to comply with Door-to-Floor procedures, and that, even with the benefit of those resources, strict compliance still would have been impossible due to the physical layout of Store 694 and the remote location of its receiving dock. (*See Id.* ¶¶ 211-226.) Third, the same structural layout and lack of resources prevented compliance with Best Methods, particularly because those factors contributed to theft, improper processing, and other shrink-worsening problems. (*See Id.* ¶¶ 227-246.)

Finally, Plaintiff suggests that his final review score may have been downgraded from a higher score. Mr. Gable, Plaintiff's District Manager, prepared his FY 2009 Review and submitted it for consideration by a committee that included Mr. Connell. (Defs.' 56.1 ¶¶ 39-40; Pl.'s 56.1 Resp. ¶¶ 269-70.) Mr. Gable testified that perhaps 25% of performance reviews were downgraded at this committee stage, though he did not recall whether any of Plaintiff's reviews were downgraded based on Mr. Connell's input. (*See* Tr. of Dep. of Rodney Gable ("Gable Dep.") 278:6-280:5, 335:5-336:20, Ex. A to the Decl. of Aaron N. Solomon ("Solomon Decl."), Dkt. Entry No. 37-12.) Mr. Gable further testified that he and Mr. Connell sometimes differed in their opinions of Plaintiff's performance, and that Plaintiff's FY 2009 Review did not reflect his "opinion of where [Plaintiff] should have been rated" in light of the difficulties of managing

Store 694.  (*See Id.* 283:10-284:14.)  While Plaintiff therefore suggests that Mr. Connell may have downgraded his review at the committee stage, Plaintiff does not present any evidence or even allege that such action would have been against Company policy or practice.

### B.   August 2009 Performance Review

Plaintiff received an interim performance review in August 2009 ("August 2009 Review"), also prepared by Mr. Gable.  (Defs.' 56.1 ¶ 58; Pl.'s 56.1 Resp. ¶ 58.)  Plaintiff again placed in the "Meets Objectives" category, but his review score fell from 52.5 to 50.5.  (Defs.' 56.1 ¶ 59; *see also* August 2009 Review, Ex. L to the Kesselman Decl.)  As with his FY 2009 Review, Plaintiff was recognized for positive sales performance, but admonished for inconsistent recovery procedures and non-compliance with Best Methods and Door-to-Floor procedures. (*See* August 2009 Review.)  In fact, the review noted that Best Methods were "non existent at [the Store's] front end" operations.  (*See Id.*)  The review also indicated problems with "[s]izing, merchandise presentation and flexing of sales floor," as well as payroll overages and substandard LCA audit scores in the areas of shrink, operations, and human resources.  (*See Id.*)

At his deposition, Plaintiff agreed that he failed to follow Door-to-Floor procedures and certain aspects of Best Methods, admitting that he "couldn't handle the amount of merchandise coming into the store."  (*See* Pl. Dep. 203:16-205:24.)  Recognizing a need for improvement, Plaintiff undertook efforts in the summer of 2009 to hire and train new associates, reassign coordinators to different departments, and discharge employees with poor customer service attitudes.  (*See* Pl. Dep. 205:13-214:21.)  While Plaintiff was hopeful these personnel changes would produce better results, over the next several months several assistant managers and associates Plaintiff relied upon either were transferred or voluntarily left their positions.  (*See Id.* 220:23-21.)

### C. March 2010 Action Plan and Performance Note

In March 2010, Plaintiff consulted Mr. Gable and, based upon his advice, developed an action plan ("March 2010 Action Plan") intended to correct operational deficiencies at his Store. (*See Id.* 229:12-24.)  The plan focused on achieving Door-to-Floor standards through specific objectives, such as decluttering the back room by eliminating the use of tubs for merchandise storage.  (*See* Defs.' 56.1 ¶¶ 76-77; Pl.'s 56.1 Resp. ¶ 76-77; *see also* Pl. Dep. 230:3-19.) Nevertheless, Plaintiff admits that he did not consistently achieve that objective.  (Defs.' 56.1 ¶ 78; Pl.'s 56.1 Resp. ¶ 78.)  On April 22, 2010, Mr. Gable issued a "Performance Note" to Plaintiff's employee file due to his failure to "follow[ ] through on the [March 2010 Action Plan] to improve overall store conditions."  (*See* Performance Note, Ex. N to the Kesselman Decl.) The note indicated that it also was issued because Plaintiff did not "respond[ ] honestly" when asked about his Store's compliance with Company procedures.  (*See Id.*)  Mr. Gable testified that he did not believe the note was warranted, but was directed by Mr. Connell to issue it.  (*See* Gable Dep. 294:18-297:14.)  In particular, Mr. Gable thought that certain improvements at Store 694 were going unrecognized, and that Plaintiff's "dishonesty" was more an issue of downplaying problems to tell "people [what they] want to hear."  (*See Id.*)

### D. FY 2010 Performance Review

In April 2010, Plaintiff received his year-end performance review ("FY 2010 Review"). (*See* FY 2010 Review, Ex. M to the Kesselman Decl.)  Plaintiff's review score again declined, this time to a score of 45.  (*Id.*)  Plaintiff was commended for driving sales, and for his leadership in managing employees and changing the Store culture.   (*See Id.*)  However, the review also noted inconsistent compliance with Door-to-Floor procedures, employee scheduling

requirements, recovery, and store presentation standards. (*See Id.*) The review further indicated a shrink rate of 5.43% for Store 694, highest among all the stores in its district and equivalent to a real dollar loss of $836,050. (Defs.' 56.1 ¶¶ 90-91; Pl.'s 56.1 Resp. ¶¶ 90-91; *see also* Decl. of Michael Connell ("Connell Decl.") ¶ 12 with Ex. C, Dkt. Entry Nos. 37-6 and 37-7.) At his deposition, Plaintiff agreed that he failed to comply fully with Best Methods, and that other critiques in his FY 2010 Review were accurate. (*See* Pl. Dep. 255:25-256:23.)

 **E.**  **October 2010 Performance Review and Fall 2010 Action Plans**

 Ms. Jean-Francois replaced Mr. Gable as Plaintiff's District Manager in April 2010. (Defs.' 56.1 ¶ 100; Pl.'s 56.1 Resp. ¶ 100.) In August 2010, the Company conducted an audit of Store 694, detecting several areas of operational deficiency that Plaintiff does not dispute. (Defs.' 56.1 ¶ 101; Pl.'s 56.1 Resp. ¶ 101; *see also* Pl. Dep. 295:4-295:15.) Based on the lackluster audit results, Ms. Jean-Francois recommended to Plaintiff that he create another action plan. He did so in September 2010, drafting a plan ("September 2010 Action Plan") that set several objectives, such as reducing his Store's shrink rate. (Defs.' 56.1 ¶ 102; Pl.'s 56.1 Resp. ¶ 102; *see also* September 2010 Action Plan, Ex. O to the Kesselman Decl.)

 On October 25, 2010, Ms. Jean-Francois issued Plaintiff's interim performance review ("October 2010 Review"). (Defs.' 56.1 ¶ 103; Pl.'s 56.1 Resp. ¶ 103.) As part of the review, Plaintiff completed a self-assessment in which he ranked himself in the "Clear Development Needs" category, with a score of 40/100. (*See* October 2010 Review, Ex. P to the Kessleman Decl.) While Plaintiff noted his positive performance record in certain areas, such as sales and employee relations, he also reported that his Store did not operate at Door-to-Floor standards and had exceeded its budget in the prior six months. (*See* Defs.' 56.1 ¶¶ 106-07; Pl.'s 56.1 Resp. ¶¶ 106-07; *see also* October 2010 Review.) At his deposition, Plaintiff testified that he rated his

performance so poorly only because he was "very critical" of himself.  (*See* Pl.'s 56.1 ¶ 104; *see also* Pl. Dep. 305:1-307:2.)

Ms. Jean-Francois also ranked Plaintiff in the "Clear Development Needs" category on his October 2010 Review.  (Defs.' 56.1 ¶ 109; Pl.'s 56.1 Resp. ¶ 109.)  Among other deficiencies, Ms. Jean-Francois noted that overall store presentation standards were inconsistent, Best Methods were not being followed, strategic scheduling was "non-existent," and recovery procedures were not executed properly.  (*See* October 2010 Review.)  As a result of his substandard review, in October, Plaintiff 2010 drafted yet another action plan ("October 2010 Action Plan.")  The plan identified a number of performance objectives, and set a deadline of November 6, 2010 for achieving those objectives.  (*See* October 2010 Action Plan, Ex. Q to the Kessleman Decl.)

## IV.    Disciplinary Action and Plaintiff's Termination

### A.    First Written Warning

Marshalls maintains a Company-wide disciplinary policy consisting of three steps:  (1) a "First Written Warning"; (2) a "Second Written Warning"; and, finally, (3) termination.  (*See* Defs.' 56.1 ¶ 37; Pl.'s 56.1 Resp. ¶ 37.)  On November 19, 2010, Ms. Jean-Francois issued Plaintiff a First Written Warning, having determined that he failed to achieve the objectives outlined in his October 2010 Action Plan by the November 6 deadline.  (Defs.' 56.1 ¶ 119; Pl.'s 56.1 ¶ 119; *see also* Tr. of Dep. of Jacqueline Jean-Francois ("Jean-Francois Dep.") 205:19-206:10, Ex. B to the Solomon Decl.)  The warning also was issued because Store 694 failed another Company audit, conducted on November 8, 2010.  (*See* Defs.' 56.1 ¶ 121; Pl.'s 56.1 ¶ 121; Pl. Dep. 328:17-329:22.)  Finally, the warning stated that the Store was operating over-budget and out of compliance with Best Methods.  (*See* First Written Warning, Ex. R to the

Kesselman Decl.)  In fact, the warning noted that the Store's payroll overage of $12,250 in October 2010 was greater than the overages for all the other stores in the district combined.  (*See Id.*)  Accordingly, the warning advised Plaintiff that he was required to meet the payroll budget for the remainder of the year, and that failure to do so or to correct any of the other noted deficiencies could result in further disciplinary action and, ultimately, termination.  (*See Id.*)

Plaintiff was permitted to submit a comment to the First Written Warning.  He did so, responding to the budget problems complained of by noting that his Store's payroll budget recently had been decreased.  (*See Id.*)  The comment reflected Plaintiff's persistent belief that, despite at other times receiving payroll increases to handle a higher sales volume, Store 694 had an insufficient payroll budget.  (*See* Defs.' 56.1 ¶¶ 92, 96; Pl.'s 56.1 Resp. ¶¶ 92, 96; *see also* Pl. Dep. 226:12-17; 252:14-17.)  According to Plaintiff, he made several requests for payroll increases that Mr. Gable elevated to Mr. Connell.  (*See* Pl. Dep. 252:9-253:16.)  Sometimes Mr. Connell granted the request, and sometimes he did not, but Plaintiff never felt the decision had anything to do with his age.  (*See Id.* 201:6-15, 202:12-22, 226:24-227:2, 252:9-253:16.)  Plaintiff also discussed the possibility of a budget increase with Ms. Jean-Francois in June 2010.  (Pl.'s 56.1 Resp. ¶ 258; Defs.' Response to Plaintiff's Rule 56.1 Counter-Statement of Material Facts ("Defs.' 56.1 Resp.") ¶ 258, Dkt. Entry No. 37-15.)  Ms. Jean-Francois declined to approve a budget increase, or to seek approval for the increase from senior management.[6]  (Pl.'s 56.1 Resp. ¶¶ 258-59; Defs.'56.1 Resp. ¶¶ 258-59.)  She believed that Store 694, with the second highest payroll budget among stores in its district, already had a sufficient budget to handle its sales volume.  (Pl.'s 56.1 Resp. ¶¶ 257-59; Defs.' 56.1 Resp. ¶¶ 257-59; *see also* Jean-Francois

---

[6]  Marshalls reviewed store budgets at the mid-year point and, when appropriate, revised them.  (*See* Pl.'s 56.1 Resp. ¶ 251; Defs.' 56.1 Resp. ¶ 251.)  When a store's sales increased and outpaced Company projections, a corresponding payroll budget increase could be granted to the store to assist it in handling any additional flow in merchandise. (Pl.'s 56.1 Resp. ¶¶ 251-54; Defs.' 56.1 Resp. ¶¶ 251-54.)  In addition, at any time, a store manager could request a payroll budget increase from his or her district manager.  (Pl.'s 56.1 Resp. ¶¶ 256; Defs.' 56.1 Resp. ¶¶ 256.)

Dep. 54:13-56:16, 210:11-211:17.)

### B. Second Written Warning

Ms. Jean-Francois conducted an audit of Store 694 on February 24, 2011. (Defs.' 56.1 ¶ 130; Pl.'s 56.1 Resp. ¶ 130.) Thereafter, on March 3, 2011, she issued Plaintiff a Second Written Warning because the audit results revealed that Plaintiff's Store was not operating "at best methods or even . . . close to it." (Defs.' 56.1 ¶ 134; Pl.'s 56.1 Resp. ¶ 134; *see also* Second Written Warning, Ex. S to the Kesselman Decl.) The warning noted several other operational deficiencies at Store 694, including Plaintiff's failure to properly execute "snapback" procedures designed to revamp the Store after the busy holiday season. (*See* Defs.' 56.1 ¶ 132; Pl.'s 56.1 Resp. ¶ 132; *see also* Second Written Warning; Pl. Dep. 340:10-16; Jean-Francois Dep. 223:10-12.) The warning expressly provided that Plaintiff would face "immediate termination" if he did not "execute best methods" and achieve satisfactory LCA Audit scores within 30 days. (*See* Second Written Warning.)

### C. Termination

In early 2011, results from FY 2011 showed that, despite its strong sales performance, Store 694 continued to underperform Company expectations in several key areas. (*See* Ex. D to the Connell Decl.) For example, the Store's shrink rate increased from 5.43% in FY 2010 to 6.25% in FY 2011, significantly exceeding the goal of 4.0% set by the Company, and amounting to a real dollar loss of $1,034,091. (Defs.' 56.1 ¶¶ 145-46; Pl.'s 56.1 ¶¶ 145-46; *see also* Ex. D to the Connell Decl.) At his deposition, Plaintiff testified that the elevated shrink rate stemmed from an increase in the volume of merchandise shipped to his Store, as well as a new layaway policy mandated by the Company. (*See* Pl. Dep. 364:18-368:24.) Plaintiff nevertheless acknowledged that a 6.25% shrink rate was "not an acceptable level in any store." (Pl. Dep.

368:21-24.)

In addition, a Company audit in early 2011 revealed that certain assistant managers at Plaintiff's Store had manipulated the payroll, "directly result[ing] in a $1700 payout to associates." (*See* Management Corrective Action Form ("Termination Notice"), Ex. F to the Connell Decl.; *see also* Pl. Dep. 349:17-351:25.) Plaintiff testified that he was not aware of the payroll misconduct when it was committed, but later learned of it when a Company "rapid response" team was dispatched to his Store to investigate. (*See* Pl. Dep. 349:17-351:25.) Plaintiff nevertheless admitted that the misconduct resulted, in part, from his failure to properly oversee and review payroll submissions. (*See* Pl. Dep. 350:12-351:25.)

Based on that payroll misconduct, as well as her determination that Plaintiff failed to meet the 30-day deadline for achieving the objectives outlined in the Second Written Warning, Ms. Jean-Francois met with Human Resources representatives Diana Kimbrel ("Ms. Kimbrel") and Joe Taylor ("Mr. Taylor") in April 2011 to discuss Plaintiff's termination. (*See* Defs.' 56.1 ¶ 165; Pl.'s 56.1 Resp. ¶ 165; *see also* Termination Notice.) They reached a formal decision to terminate Plaintiff, which was elevated to Mr. Connell and approved by him in accordance with Company practice.[7] (Defs.' 56.1 ¶ 165; Pl.'s 56.1 Resp. ¶ 165.) Accordingly, on April 4, 2011, Ms. Jean-Francois advised Plaintiff that his employment was being terminated. (Defs.' 56.1 ¶ 158; Pl.'s 56.1 Resp. ¶ 158.) The Termination Notice that Plaintiff received indicated that it was issued due to the payroll misconduct that had occurred under Plaintiff's management, as well as his failure to implement Best Methods in line with Company standards. (*See* Termination Notice.") Among other bases for termination, the notice also identified Plaintiff's failure to properly implement "snapback" procedures at Store 694. (*See Id.*)

---

[7] At the time Plaintiff was terminated, Ms. Jean-Francois was 45 years old, Ms. Kimbrel was 47 years old, Mr. Taylor was 50 years old, and Mr. Connell was 61 years old. (Defs.' 56.1 ¶ 166; Pl.'s 56.1 Resp. ¶ 166.)

At his termination meeting with Ms. Jean-Francois, Plaintiff did not raise any concerns that he was being terminated based on his age, nor did he ever complain to anyone at Marshalls during his employment that he was being discriminated against or treated unfairly because of his age. (*See* Pl. Dep. 348:21-349:16.) On an application for unemployment benefits Plaintiff completed shortly after his termination, he reported that he was fired for failure to comply with the objectives outlined in the Second Written Warning, noting: "I was given an additional 30 days – I was unable to complete Best Methods due to other responsibilities in the store." (Ex. T to the Kesselman Decl.) Finally, Plaintiff stated at his deposition that he "believe[s] [he] was terminated because of not meeting company standards." (Pl. Dep. 373:5-374:6.) When asked whether he believed his age played any role in his termination, Plaintiff responded, "That, I don't know." (*Id.* 374:3-6.)

## V. The Alleged Discrimination

While working under the supervision of Ms. Jean-Francois, Plaintiff felt that she was trying to replace him with a younger store manager. (Pl. Dep. 276:25-277:5.) On a couple of occasions, though Plaintiff does not recall when, Ms. Jean-Francois was conversing with Plaintiff and referred to historical events as happening in "your generation," including developments in the retail industry over time and how tasks handled on the computer once were done manually. (*See Id.* 276:4-23, 282:15-283:23.) Approximately two to three months before Plaintiff's termination, Ms. Jean-Francois also commented to him that he looked "burned out" and that his assistants were "hav[ing] to do more," though Ms. Jean-Francois did not expressly tie her comments to Plaintiff's age. (*See Id.* 279:14-281:5.) Another colleague, Nick Cassemi ("Mr. Cassemi"), also referred to Plaintiff as "Old Man" on "less than 10 occasions," but Plaintiff took the comments jokingly and never believed that they were discriminatory. (*See Id.*

270:9-273:21.)

In addition, Plaintiff learned before his termination that Ms. Jean-Francois had offered his position to two younger employees, Rena Valdman ("Ms. Valdman") and Joanne Esposito ("Ms. Esposito"). (Defs' 56.1 ¶¶ 183-85; Pl.'s 56.1 Resp. ¶ 183-85; *see also* Pl. Dep. 277:2-279:2.) Ms. Valdman, 48 years old at the time, and Ms. Esposito, 52, both declined the offer. (*See* Pl. Dep. 286:4-18; Jean-Francois Dep. 236:19-237:5.) Thus, the position was offered to Ms. Jean-Francois' third choice, Sean Thom ("Mr. Thom"), aged 36, who accepted and took over management of Store 694. (Defs.' 56.1 ¶ 186; Pl.'s 56.1 Resp. ¶ 186.) Plaintiff also alleges that Ms. Jean-Francois forced out two other older store managers while she was district manager, and replaced them with younger employees. (*See* Pl.s 56.1 Resp. ¶¶ 282-319.)

Finally, in briefing on the instant motion, Plaintiff contends that younger managers of other Marshalls stores in the district had performance deficiencies comparable to his, but were not similarly disciplined. (See Pl.'s Opp'n at 16-21.) Plaintiff points specifically to the treatment of Mr. Thom, his replacement and previously the manager of store 601, and of Mike Imerukaj ("Mr. Imerukaj"), promoted to manager of store 497 in 2011 when he was approximately 31 years old. (*See Id.*; see also Defs.' 56.1 ¶ 187; Pl.'s 56.1 Resp. ¶¶ 187, 264-67, 282-319.) It is undisputed that, while Mr. Imerukaj was under the supervision of Ms. Jean-Francois, he never was formally disciplined for his store's high shrink rate or his failure to adhere to Best Methods, even though his Store: (1) had a shrink rate of 7.4% in FY 2011 and 6.21% in FY 2012, compared to rates of 5.43% and 6.25% at Plaintiff's store in FY 2010 and FY 2011, respectively; (2) failed to reach sales targets in FY 2011; (3) had difficulty controlling shoes damages, just like Plaintiff's Store; (4) exceeded its payroll budget by $44,000 in FY 2011; and (5) was 13.53% above plan for controllable expenses in FY 2011, whereas Plaintiff's

store was 13.83% over plan during the same period. (*See* Pl.'s 56.1 Resp. ¶¶ 245-49, 265, 286-89, 291, 315; Defs.' 56.1 Resp. ¶¶ 245-49, 265, 286-89, 291, 315.) Plaintiff contends that Mr. Thom was not disciplined either, despite the fact that after Mr. Thom took over as manager of store 694, controllable expenses increased drastically to 36.01% over plan in FY 2012. (*See* Pl.'s 56.1 Resp. ¶¶ 316-17; Defs.' 56.1 Resp. ¶¶ 316-17.) Finally, Plaintiff also points to Mr. Imerukaj's performance as an assistant manager at store 875, prior to being promoted to manager of store 497. Mr. Gable, who supervised Mr. Imerukaj in that role, testified that Mr. Imerukaj was "highly incompetent" as an assistant manager, and that he demonstrated an inability to "follow through" with Best Methods and Door-to-Floor standards. (*See* Pl.'s 56.1 Resp. ¶¶ 294-309; Defs.' 56.1 Resp. ¶¶ 294-309.)

## STANDARD OF REVIEW

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "In ruling on a summary judgment motion, the district court must resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment and determine whether there is a genuine dispute as to a material fact, raising an issue for trial." *McCarthy v. Dun & Bradstreet Corp*., 482 F.3d 184, 202 (2d Cir. 2007) (internal quotations omitted). A fact is "material" within the meaning of Rule 56 when its resolution "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. To determine whether an issue is genuine, "[t]he inferences to be drawn from the underlying affidavits, exhibits, interrogatory answers, and depositions must be viewed in the light most favorable to the party

opposing the motion." *Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 202 (2d Cir. 1995) (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (per curiam) and *Ramseur v. Chase Manhattan Bank*, 865 F.2d 460, 465 (2d Cir. 1989)).  "[T]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255. However, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

The moving party bears the burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] . . . which it believes demonstrates the absence of a genuine issue of fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotations omitted).  Once the moving party has met its burden, "the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (emphasis omitted).  The nonmoving party must offer "concrete evidence from which a reasonable juror could return a verdict in [its] favor." *Anderson*, 477 U.S. at 256.  The nonmoving party may not "rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible, or upon the mere allegations or denials of the nonmoving party's pleading." *Ying Jing Gan v. City of New York*, 996 F.2d 522, 532-33 (2d Cir. 1993) (citations and internal quotations omitted).  "Summary judgment is appropriate only '[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party.'" *Donnelly v. Greenburgh Cent. Sch. Dist. No. 7*, 691 F.3d 134, 141 (2d Cir. 2012) (quoting *Matsushita*, 475 U.S. at 587).

Although employment discrimination cases raise special issues of an employer's

motivation or intent that are not always suitable for determination on a motion for summary judgment, *see Kenney v. New York City Dep't of Educ.*, 2007 WL 3084876, at *7 (S.D.N.Y. Oct. 22, 2007), the Second Circuit unequivocally has rejected the notion that summary judgment is unavailable to defendants in such cases.  *See Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000) (quotation marks and citation omitted.)  It follows that, "[e]ven in the discrimination context . . . a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment."  *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008.)

## DISCUSSION

I.      **Legal Standard**

Plaintiff claims that he wrongfully was discriminated against and discharged on the basis of his age in violation of the ADEA and NYCHRL.  Both claims are analyzed under the *McDonnell Douglas* burden-shifting paradigm used in Title VII employment discrimination cases.  *See Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 76 (2d Cir. 2005.); *see also Waldorf v. Liberty Maintenance, Inc.*, 2007 WL 942103, at *4 (S.D.N.Y. Mar. 29, 2007.)  Under that framework, the plaintiff bears the initial burden of establishing a *prima facie* case of discrimination by showing: (1) his membership in a protected class; (2) qualification for the job; (3) an adverse employment action; and (4) circumstances surrounding the action that give rise to an inference of discrimination.  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973).  The plaintiff's burden at the *prima facie* stage is *de minimis*.  *See Beyer v. County of Nassau*, 524 F.3d 160, 163 (2d Cir. 2008); *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 467 (2d Cir. 2001).  If the plaintiff can establish a *prima facie* case, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the employment action at issue.  *McDonnell Douglas*, 411 U.S. at 802-03.  Assuming, *arguendo*, the defendant does so, the

"presumption of discrimination arising with the establishment of the *prima facie* case drops from the picture," *Weinstock*, 224 F.3d at 42, and the burden reverts to the plaintiff to show that the employer's proffered reason is pretext for a discriminatory motive, *McDonnell Douglas*, 411 U.S. at 804.

The ADEA does not recognize "mixed motive" liability, *i.e.* liability where age was one "motivating factor" in an adverse employment decision. *See Gross v. FBL Financial Services, Inc.*, 557 U.S. 167, 175-77 (2009). To prevail on an ADEA claim, a plaintiff instead must show that age was the "but-for" cause of the employer's decision. *See Id.* Therefore, this Court will not evaluate Plaintiff's ADEA claim using a mixed motive analysis. However, it will evaluate Plaintiff's NYCHRL claim under that framework, as New York courts continue to recognize mixed motive liability in age discrimination cases brought under the NYCHRL. *See, e.g., Melman v. Monterfiore Med. Ctr.*, 98 A.D.3d 107, 126-127 (1st Dep't 2012); *see also Weiss v. JPMorgan Chase & Co.*, 2010 WL 114248, at *3-4 (S.D.N.Y. Jan. 13, 2010).

## II.     Application of *McDonnell Douglas*

### A.     *Prima Facie* Case of Discrimination

Defendants do not dispute that Plaintiff is a member of a protected class under the ADEA by virtue of his age, or that his termination constituted an adverse employment action. (*See* Defs.' Mem. at 6.) Thus, Defendants challenge only those elements of Plaintiff's *prima facie* case that require Plaintiff to show he was qualified for his position, and was terminated under circumstances giving rise to an inference of discrimination. In light of Plaintiff's *de minimis* burden, the Court finds that Plaintiff has adequately established those elements.

As an initial matter, when an employer makes its own judgment regarding the plaintiff's qualification for a position, as Defendants did here when they hired Plaintiff, "the inference of

minimal qualification is not difficult to draw." *Slattery v. Swiss Reins Am. Corp.*, 248 F.3d 87, 92 (2d Cir. 2001); *see also Gregory v. Daly*, 243 F.3d 687, 696 (2d Cir. 2001). Furthermore, although Plaintiff remained in his position only for approximately two-and-a-half years, that term was sufficiently lengthy to support an inference that he was qualified for his job. *See Mattera v. JPMorgan Chase Corp.*, 740 F. Supp. 2d 561, 572 (S.D.N.Y. 2010) (despite receiving poor performance evaluations, fact that plaintiff was hired for position and remained employed for two years satisfied minimal burden to show qualification).

Defendants nonetheless contend that Plaintiff's poor performance reviews show that he was not qualified. (*See* Defs.' Mem. at 6-11.) That argument ignores the fact that Plaintiff's reviews also rated certain aspects of his management favorably, such as his sales performance. Moreover, Defendants misapprehend Plaintiff's burden at this stage of the *McDonnell Douglas* analysis, which is not to demonstrate that Defendants were satisfied with his performance, but merely to "establish [his] basic eligibility for the position at issue." *Grant v. Roche Diagnostics Corp.*, 2011 WL 3040913, at *6 (E.D.N.Y. July 20, 2011) (quoting *Slattery*, 248 F.3d at 92.); *accord Powell v. Syracuse Univ.*, 580 F.2d 1150, 1155 (2d Cir. 1978). In light of that minimal burden, Plaintiff has adequately demonstrated that he was qualified for his position.

Defendants also contend that Plaintiff was not terminated under circumstances giving rise to an inference of discrimination. Defendants rely, in part, on the "same actor inference," which is an inference strongly suggesting that an employer-defendant did not act with discriminatory intent where the "person who made the decision to fire [the plaintiff] was the same person who made the decision to hire [the plaintiff]." *Grady v. Affiliated Central, Inc.*, 130 F.3d 553, 560 (2d Cir. 1997). "The inference is applicable so long as one management-level employee played a substantial role in both the hiring and firing of the plaintiff." *Jones v. Yonkers Pub. Schools*,

326 F. Supp. 2d 536, 546 (S.D.N.Y. 2004) (internal quotation marks omitted).

Here, despite Plaintiff's argument to the contrary, the record clearly establishes that Mr. Connell played a significant role in Plaintiff's hiring. (*See* Pl. Dep. 62:4-16, 415:5-6; Gable Dep. 243:13-244:8.) However, the record is less clear with respect to the role Mr. Connell played in firing Plaintiff. While Mr. Connell ultimately "pulled the trigger" on Plaintiff's discharge by approving the termination decision, he testified that he had "nothing to do" with making that decision. (*See* Connell. Dep. 210:24-211:25.) Rather, Ms. Jean-Francois, after consultation with Ms. Kimbrel and Mr. Taylor, came to him with the decision, and he "just said, yes." (Connell Dep. 211:4-11.) On the other hand, Mr. Connell also testified that he was aware of the facts concerning Plaintiff's performance and disciplinary history at the time he approved Plaintiff's termination. (*See Id.* 216:4-18.) Resolving all inferences in favor of Plaintiff, as the Court must, application of the same actor inference may not be appropriate given the ambiguity as to what discretion Mr. Connell exercised with regard to Plaintiff's termination.

Furthermore, the law in this Circuit recognizes that an employer's replacement of an older employee with a significantly younger one typically will give rise to an inference of discrimination. *See D'Cunha v. Genovese/Eckerd Corp.*, 479 F.3d 193, 195 (2d Cir. 2007) (inference of age discrimination where applicant passed over in favor of one eight years younger); *see also Mattera*, 740 F. Supp. 2d at 573. Here, Plaintiff was 63 years old when Defendants sought to replace him with Ms. Valdman, aged 48, Ms. Esposito, 52, and, ultimately, 36-year-old Mr. Thom. Even though two of the potential replacements were members of Plaintiff's protected class, a discriminatory motive can be inferred from Defendants' repeated efforts to fill Plaintiff's position with a younger worker. *See, e.g., Tarshis v. Riese Org.*, 211 F.3d 30, 38-9 (2d Cir. 2000), *abrogated on other grounds*, 122 S. Ct. 992 (2002); *see also*

*Hollander v. Amer. Cyanamid Co.*, 172 F.3d 192, 199 (2d Cir. 1999), *abrogation on other grounds recognized*, 512 F. App'x 32 (2d Cir. 2013). While other evidence in the record unquestionably weakens that inference, Plaintiff has adequately demonstrated the fourth element of his *prima facie* case, and, thus, has shifted the burden to Defendants to articulate a legitimate, non-discriminatory basis for his termination.

### B.     Legitimate, Non-Discriminatory Reason for Termination

Plaintiff concedes that Defendants can articulate a legitimate, non-discriminatory reason for terminating him. (*See* Pl.'s Opp'n at 14-16.) Namely, there is a well developed record documenting Plaintiff's failure to meet Defendants' performance expectations in several key respects. (*See* Defs.' Mem. at 6-11.) Defendants memorialized their dissatisfaction with Plaintiff's performance in no less than four separate performance reviews, a note to Plaintiff's file, two written warnings, and, ultimately, the Termination Notice. (*See* Exs. K, L, M, N, O, P, Q, R, S to the Kessleman Decl.; Ex. F to the Connell Decl.) Although Defendants concede that Plaintiff improved sales at his Store, and point out that he was commended for doing so, they contend that those sales did not overcome his numerous documented performance deficiencies. (*See* Def. Mem. at 9; *see also* Jean-Francois Dep. 117:1-119:15.)

Plaintiff either does not dispute, or fails to legitimately dispute, that under his management Store 694 repeatedly failed to meet performance targets and operational standards[8], execute proper recovery procedures[9], comply fully with Best Methods[10], and achieve an acceptable shrink rate[11]. Plaintiff also does not dispute that his Store failed or otherwise performed poorly on three separate audits while he was manager. (Defs' 56.1 ¶¶ 101, 121, 130-

---

[8]  *See* Defs.' 56.1 ¶¶ 48-52, 72-75, 84, 89-90, 104, 106, 142- 145, 148, 157, 160; Pl.'s 56.1 Resp. ¶¶ 48-52, 72-75, 84, 89-90, 104, 106, 142- 145, 148, 157, 160.

[9]  *See* Defs.' 56.1 ¶¶ 50, 61, 108, 111; Pl.'s 56.1 Resp. ¶¶ 50, 61, 108, 111.

[10] *See* Defs.' 56.1 ¶¶ 56, 63, 70, 71, 87, 98, 110, 131; Pl.'s 56.1 Resp. ¶¶ 56, 63, 70, 71, 87, 98, 110, 131.

[11] *See* Defs.' 56.1 ¶¶ 29, 44-47, 90-91, 143-145-48; Pl.'s 56.1 Resp. ¶¶ 29, 44-47, 90-91, 143-145-48.

31; Pl.'s 56.1 Resp. ¶¶ 101, 121, 130-31.) Although Plaintiff contends that other managers in his district struggled to meet performance expectations, the record demonstrates that Store 694 stood out as particularly deficient in several respects. For example, it had the worst shrink rate among stores in its district in FY 2009 and FY 2010, and the second worst rate in FY 2011. (Defs.' 56.1 ¶¶ 45, 91, 146; Pl.'s 56.1 Resp. ¶¶ 45, 91, 146.) In FY 2011, it ranked last or second-to-last among stores in its district in shrink, damages, controllable expense variance, customer service reporting, and LCA Audit scores for shrink, operations, human resources, and sizing. (Defs.' 56. 1 ¶ 144; Pl.'s 56.1 Resp. ¶ 144.)

Finally, Plaintiff was terminated in strict compliance with Marshalls' disciplinary policy. As set forth in the Termination Notice Plaintiff received, he was fired based upon his failure to correct the deficiencies outlined in the Second Written Warning, which explicitly were subject to a 30-day deadline for compliance. (*See* Ex. F to the Connell Decl.) The Termination Notice also was based on employee payroll misconduct at Store 694, which resulted, in part, from Plaintiff's admitted failure to properly review payroll submissions. (*See* Pl. Dep. 350:12-351:25.) As Plaintiff concedes, these and other documented performance shortcomings provide Defendants with a legitimate, non-discriminatory reason for terminating him. *See Slattery*, 248 F.3d at 93; *Mattera*, 740 F. Supp. 2d at 573-74.

### C.     Pretext for Discriminatory Motive

At the third stage of the *McDonnell Douglas* analysis, Plaintiff must "produce not simply some evidence, but sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the [defendant] were false, and that more likely than not [discrimination] was the real reason for the employment action." *Weinstock*, 224 F.3d at 42 (internal quotation marks omitted). In other words, "the burden shifts back to the plaintiff to

prove that discrimination was the real reason for the employment action." *Graham v. Long Island R.R.*, 230 F.3d 34, 38 (2d Cir. 2000.)

Here, Plaintiff contends that he was fired under the pretext that his performance was unsatisfactory. Yet, roughly six months before his termination, Plaintiff completed a self-assessment in which he rated his own performance as unsatisfactory. (Defs. 56.1 ¶ 104; Pl.'s 56.1 Resp. ¶ 104.) Plaintiff also admitted in his own deposition testimony that many of the deficiencies identified in his performance reviews, written warnings, and the Termination Notice were accurate. For example, Plaintiff concedes that the deficiencies noted in the First Written Warning, which partially were based on the results of a third party audit Plaintiff acknowledges he failed, "were not incorrect." (*See* Pl. Dep. 329:4-330:8.) Although Plaintiff blames those deficiencies on personnel shortages at his Store, he admits that those shortages had nothing to do with his age. (*Id.* 330:18-23; *see also* Defs.' 56.1 ¶ 122; Pl.'s 56.1 Resp. ¶ 122.) Plaintiff also agrees that deficiencies cited in the Second Written Warning either were accurate or "fair" criticisms, and that, despite having delegated some of those responsibilities to assistant managers, he ultimately was at fault. (*See* Pl. Dep. 339:25-343:22.) In fact, Plaintiff testified that he did not expect to receive the Second Written Warning, but was not surprised when he did because he knew his Store was not operating at Best Methods, particularly in the back room. (*See Id.* 338:15-339:12, 342:18-343:10.)

Moreover, Plaintiff admits that he never corrected the deficiencies cited in the Second Warning, despite its clear admonition that failure to correct those deficiencies within 30 days would result in his termination. (*See id.* 347:14-25.) Plaintiff testified that he could not meet those expectations because, "[T]he Back Room . . . [was] full of merchandise coming in, I had turnover in my Back Room, I had to retrain people, my operations manager was new." (*See Id.*)

But when asked what connection there was between employee turnover or merchandise volume and his claims of age discrimination, Plaintiff admitted that there probably was none. (*See Id.* 348:2-20.) Taken together, the evidence in the record does not evince that Plaintiff believed Defendants' proffered reason for terminating him was pretextual, so much as he simply disagreed with the fairness of his performance evaluations and termination.[12]

Nevertheless, Plaintiff's subjective belief that he was held to unfair standards is insufficient to sustain his burden to demonstrate pretext. *See Ricks v. Conde Nast Publications, Inc.*, 92 F. Supp. 2d 338, 347 (S.D.N.Y. 2000), *aff'd* 6 F. App'x 74 (2d Cir. 2001) ("The mere fact that an employee disagrees with her employer's assessments of her work, however, cannot standing on its own show that her employer's asserted reason for termination was pretextual."); *see also McLee v. Chrysler Corp.*, 109 F.3d 130, 135 (2d Cir. 1997) (defendant entitled to summary judgment where plaintiff offered only "disputations [that] were rationalizations for his deficiencies rather than demonstrations of any genuine issue of material fact to be tried.") This Court is not in a position to second guess the performance expectations Defendants imposed upon Plaintiff, as Defendants, and not this Court, "have the requisite experience in setting employment qualifications." *Pasha v. William M. Mercer Consulting, Inc.*, 2004 WL 188077, at *9 (S.D.N.Y. Feb. 2, 2004), *aff'd* 135 F. App'x 489 (2d Cir. 2005) (citation omitted); *see also Soderberg v. Gunther Int'l Inc.*, 124 F. App'x 30, 32 (2d Cir. 2005); *Dister v. Continental Grp., Inc.*, 859 F.2d 1108, 1116 (2d Cir. 1988).

Despite essentially admitting that his performance was deficient and that he was terminable on that basis, Plaintiff still insists that the real reason he was fired was age

---

[12] Plaintiff believes that he was held to unrealistic standards because in his opinion, *inter alia*, Best Methods and Door-to-Floor procedures could not be implemented at his Store due to its design and other factors beyond his control (*see* Pl.'s 56.1 Resp. ¶¶ 52, 63, 67, 85, 87, 98, 211-30), his Store had inadequate staffing and training (*see Id.* ¶¶ 63, 70-71, 75, 79, 93, 111, 129), and his Store was provided an insufficient payroll budget (*see Id.* ¶¶ 121, 230, 251-261.)

discrimination. Plaintiff's papers can be read to suggest three possible grounds for a finding that Defendants' explanation for firing him was pretextual: (1) Defendants replaced him with a significantly younger worker, and similarly replaced two other store managers in his district with younger employees; (2) Ms. Jean-Francois made certain comments relating to his age; and (3) younger managers of other Marshalls stores had performance deficiencies comparable to his, but were not disciplined similarly. Plaintiff's claims of pretext fail to raise a triable issue of fact on each ground.

### i. Replacement by a Younger Worker

While sufficient to sustain his *de minimis* burden at the *prima facie* stage, the fact that Plaintiff was replaced by a younger worker is insufficient by itself to demonstrate that Defendants' non-discriminatory reason for terminating him was pretextual. *See Milano v. Astrue*, 2008 WL 4410131, at *32 (S.D.N.Y. Sept. 26, 2008), *aff'd* 382 F. App'x 4 (2d Cir. 2010); *Mattera*, 740 F. Supp. 2d at 577-78. As a matter of workforce demographics, there was a substantial likelihood that Plaintiff, who was 63 when terminated, would be replaced by a younger worker. *See Mattera*, 740 F. Supp. 2d at 577-78 ("Typically, younger workers will replace older ones; this is an unremarkable phenomenon that does not . . . prove discrimination.") (citation omitted). Plaintiff nonetheless points out that he was replaced by someone who, at age 36, was significantly his junior. While correct in that regard, Plaintiff ignores the fact that his position first was offered to Ms. Valdman and to Ms. Esposito, both members of Plaintiff's protected class. (*See* Defs.' 56.1 ¶¶ 183-85; Pl.'s 56.1 Resp. ¶¶ 183-85; *see also* Pl. Dep. 277:9-14.)

Furthermore, it is undisputed that every actor with at least some involvement in Plaintiff's termination was a member of his protected class. *See* 29 U.S.C. § 631(a) (extending

ADEA protections to any individual aged 40 or above). At the time of Plaintiff's termination, Mr. Connell was 61 years old, Ms. Jean-Francois was 45, Ms. Kimbrel was 47, and Mr. Taylor was 50, thus rendering Plaintiff's allegations of discriminatory discharge more attenuated. (*See* Defs.' 56.1 ¶ 166; Pl.'s 56.1 ¶ 166; Dep. Tr. of Diana Kimbrel ("Kimbrel Dep.") 53:17-54:5, 119:4-7, Ex. C to the Kesselman Decl.); *see* also *Drummond v. IPC Int'l Inc.*, 400 F. Supp. 2d 521, 532 (E.D.N.Y. 2005) ("[A] well-recognized inference against discrimination exists where the person who participated in the allegedly adverse decision is also a member of the same protected class."); *Pesok v. Hebrew Union Coll.-Jewish Inst. Of Religion*, 235 F. Supp. 2d 281, 287 n.5 (S.D.N.Y. 2002), *aff'd* 86 F. App'x 479 (2d Cir. 2004).

Plaintiff also suggests that Ms. Jean-Francois specifically targeted older managers for replacement by younger employees, as she recommended Plaintiff's termination and "forced" out two other older managers in the district in favor of younger ones. (*See* Pl.'s Opp'n at 20-21; *see* Pl.'s 56.1 Resp. ¶ 283.) While Plaintiff's contention rests on a characterization of Ms. Jean-Francois' deposition testimony that arguably is not supported by the transcript, the Court assumes for purposes of the instant motion that Ms. Jean-Francois did, in fact, cause the termination of the two other managers in question.[13] Evidence that an employer exhibited a "pattern of demoting or terminating older workers" can be sufficient to defeat summary judgment. *See Saenger v. Montefiore Med. Ctr.*, 706 F. Supp. 2d 494, 515 (S.D.N.Y. Mar. 31, 2010) (citing *Maresco v. Evans Chemetics*, 964 F.2d 106, 113 (2d Cir. 1992)); *see also Kourofsky v. Genencor Int'l, Inc.*, 459 F. Supp. 2d 206, 213-14 (W.D.N.Y. 2006) (denying summary judgment where "an older worker at the plant was more than three times as likely to be terminated as a younger worker.")

---

[13] Ms. Jean-Francois' testimony reflects that the two managers in question, aged 56 and 43, elected to quit after receiving feedback indicating they would be terminated if they did not improve their performance. (*See* Jean-Francois Dep. 158:3-17.)

However, Plaintiff's proffered evidence that two other older managers were terminated does not meet even the most minimal standards to show a pattern of terminating older managers. Plaintiff omits almost all data necessary to put those two alleged firings into proper context, which, at a minimum, would include the number of store managers in Plaintiff's district during his employment, the age of each manager, and the number of store managers who were fired versus the number not fired. *See Hirschberg v. Bank of America*, *N.A.*, 754 F. Supp. 2d 500, 518-19 (E.D.N.Y 2010). For example, in *Maresco v. Evans Chemetics*, the Second Circuit reversed the district court's award of summary judgment based on evidence that the defendant employer, considering post-consolidation employment positions, terminated "two of the three older accounting employees, and none of the twenty younger employees." 964 F.2d at 113. As the appeals court explained, that evidence supported an inference of discrimination, and also provided the plaintiff with a basis to prove that the employer's proffered reason for discharging older workers was pretextual. *See Id.* at 113-14.

Here, Plaintiff does not come forward with any evidence similar to that presented in *Maresco*. Instead, Plaintiff merely points to the circumstance that two other older workers were terminated, and beyond that relies entirely on speculation to substantiate his theory that older workers were unfairly targeted for termination. Moreover, Plaintiff admits elsewhere in the record that, during his employment, 13 out of 16 store managers in his district were aged 40 or above, including six who were over 50.[14] (*See* Defs.' 56.1 ¶ 167; Pl.'s 56.1 Resp. ¶ 167; *see also* Pl.'s Opp'n at 11.) Given those figures, the fact that Plaintiff and two other older managers were

---

[14] According to Plaintiff, the ages of the other managers in Plaintiff's district are irrelevant because Ms. Jean-Francois did not hire any of those other managers. (*See* Pl.'s Opp'n at 11.) That is a conclusory assertion unsupported by anything in the record, and one this Court rejects in any event. Even if Ms. Jean-Francois did not hire any of those managers, she also did not fire any of them aside from the specific individuals Plaintiff narrowly concentrates on to further his argument. Moreover, Plaintiff's myopic focus on Ms. Jean-Francois is misplaced, as the record makes it abundantly clear that personnel decisions were not made on the sole authority of the district manager, but involved the input of other parties.

replaced by younger ones does not suggest discrimination as there was a high probability that any personnel change at the management level would involve an older manager being replaced by a younger employee. Viewed in the context of the record as a whole, Plaintiff's proffered evidence is insufficient to support a conclusion by a rational trier of fact that Defendants' non-discriminatory reason for terminating Plaintiff was pretextual.

### ii. *Ageist Comments*

Plaintiff testified that his professional relationship with Ms. Jean-Francois was friendly. (Pl. Dep. 107:24-108:4, 110:8-111:12.) He also testified that Ms. Jean-Francois treated him fairly aside from her insistence on recruiting his management staff, though Plaintiff conceded that recruitment was her responsibility as a district manager. (*See Id.*) In fact, Plaintiff testified that he does not think Ms. Jean-Francois discriminated against him based on his age, just as he similarly disavowed that this lawsuit accuses Mr. Gable or Mr. Connell of any discrimination. (*Id.* 112:2-5; *see also* Defs.' 56.1 ¶¶ 57, 66, 170-71; Pl.'s 56.1 Resp. ¶¶ 57, 66, 170-71.) Nevertheless, Plaintiff contends that Ms. Jean-Francois made certain comments during his employment that he perceived as relating to his age.[15] First, on a couple of unspecified occasions, Ms. Jean-Francois referred to Plaintiff's "generation" when discussing with him how the retail industry had changed over time. (*See* Pl. Dep. 276:4-23, 282:15-283:23.) Second, roughly two to three months before Plaintiff was terminated, Ms. Jean-Francois told him he looked "burned out," and that his assistants were "hav[ing] to do more." (*See Id.* 279:14-281:5.)

Neither comment, whether considered by itself or viewed in the context of the record as a whole, raises a triable issue of fact as to Defendants' non-discriminatory reason for terminating

---

[15] Plaintiff testified that another colleague, Mr. Cassemi, referred to him as "Old Man" on several occasion. While Plaintiff thought the comments were inappropriate for the workplace, he took them jokingly, never felt they were discriminatory, and admits that they have no connection to his claims in this lawsuit. (*See* Pl. Dep. 273:8-21, 274:8-13.) Moreover, unrefuted evidence shows that Mr. Cassemi had no role in Plaintiff's termination. (*See* Connell Decl. ¶ 29; Kimbrel Dep. 53:17-54:5, 119:4-7.)

Plaintiff. It is well established that "stray remarks in the workplace, statements by non-decisionmakers, and statements by decisionmakers unrelated to the decisional process are not by themselves sufficient to satisfy [a] plaintiff's burden of proving pretext." *Burrell v. Bentsen*, 1993 WL 535076, at *8 (S.D.N.Y. Dec. 21, 1993) (quoting *Price Waterhouse v. Hopkins*, 4890 U.S. 228, 278 (1989)) (internal quotation marks omitted). When considering whether a comment is a stray remark, courts consider: (1) who made the remark, whether a decisionmaker, supervisor, or co-worker; (2) the point in time when the remark was made in relation to the employment decision at issue; (3) the content of the remark; and (4) whether the remark was related to the decision making process. *See LaMarch v. Tishman Speyer Props., L.P.*, 2006 WL 2265086, at *7 (E.D.N.Y. Aug. 8, 2006); *Sciola v. Quattro Piu, Inc.*, 361 F. Supp. 2d 61, 68 (E.D.N.Y. 2005).

Here, although Ms. Jean-Francois was involved in firing Plaintiff, there is no demonstrated temporal nexus or other relationship between Plaintiff's termination and Ms. Jean-Francois' comments regarding his "generation." *See O'Connor v. Viacom Inc./Viacom Int'l, Inc.*, 1996 WL 194299, at *5 (S.D.N.Y. Apr. 23, 1996), *aff'd* 104 F.3d 356 (2d Cir. 1996) ("[S]tray remarks . . . without a demonstrated nexus to the complained of personnel actions, will not defeat the employer's motion for summary judgment.") Plaintiff admits that he cannot recall specifically when Ms. Jean-Francois made the alleged comments, or in what context she made them. (*See* Pl. Dep. 276:15-16; 282:13). Furthermore, the comments were too "isolated and ambiguous to support a finding of age discrimination." *Pasha*, 2004 WL 188077, at *6 (quoting *Douglas v. Dist. Council 37 Mun. Employees' Educ. Fund Trust*, 207 F. Supp. 2d 282, 291 (S.D.N.Y. 2002)). The only concrete detail Plaintiff provides is that Ms. Jean-Francois remarked that tasks handled on the computer once were done manually. (*See* Pl. Dep. 283:20-23.) That

statement is age-neutral, particularly in light of Plaintiff's own testimony suggesting that Ms. Jean-Francois, a member of Plaintiff's protected class, included herself in the generation that witnessed the transition to computers in the retail industry.  (*See Id.*)

Although Ms. Jean-Francois' comment that Plaintiff looked "burned out" occurred relatively close in time to his termination, Plaintiff fails to establish any other connection between that comment and his termination aside from his own conclusory testimony that Ms. Jean-Francois perhaps wanted to replace him because she "thought [he] was getting too tired, burned out."  (*See* Pl. Dep. 279:14-281:5.)  Furthermore, Plaintiff admits that Ms. Jean-Francois never mentioned his age during their conversation, and that, despite not feeling tired, he was "working like an animal" at the time.  (*See* Pl. Dep. 279:14-281:5.)  Accordingly, a rational trier of fact could conclude that Ms. Jean-Francois' comment had nothing to do with Plaintiff's age. Indeed, courts in other age discrimination cases have found similar comments to be age-neutral. *See, e.g., LaMarch*, 2006 WL 2265086, at *6 (supervisor's comment that plaintiff "might not have the gas to continue" was age-neutral).

It is also possible, though unlikely in this Court's view, that a rational trier of fact could find that Ms. Jean-Francois' comment related to Plaintiff's age and was derogatory, notwithstanding its facial neutrality.  However unlikely that possibility, even if Plaintiff could prove that Ms. Jean-Francois' comment was related to his age, it still would constitute just an isolated stray remark lacking any demonstrated nexus to his termination.  That ambiguous remark, considered in the context of the weighty evidence of Plaintiff's underperformance, is insufficient to support a conclusion by a rational trier of fact that Defendants' non-discriminatory reason for terminating Plaintiff was pretextual.  *See Carlton v. Mystic Transp. Inc.*, 202 F.3d 129, 136 ("[E]vidence of one stray comment by itself is usually not sufficient proof to show age

discrimination . . ."); *De La Cruz v. New York City Human Res. Admin. Dep't of Social Servs.*, 884 F. Supp. 112, 116 (S.D.N.Y. 1995); *see also Lifranc v. New York City Dep't of Educ.*, 2010 WL 1330136, at *16 (E.D.N.Y. Apr. 6, 2010), *aff'd* 415 F. App'x 318 (2d Cir. 2011); *O'Connor*, 1996 WL 194299, at *13-15.

### iii. Disparate Treatment

Comparing various data points across Marshalls stores from the general timeframe when Plaintiff managed Store 694, Plaintiff argues that two younger store managers in his district had performance records similar to his, but were not similarly disciplined. (*See* Pl.'s Opp'n at 16-21.) The managers who allegedly received favorable treatment, Mr. Imerukaj and Mr. Thom, were approximately 31 and 36 years old at the time, respectively. A claim of disparate treatment may be sufficient to establish pretext if the plaintiff can show, through admissible evidence, that he or she was treated differently from other employees "similarly situated in all material respects." *Shumway v. United Parcel Serv., Inc.*, 118 F.3d 60, 64. Whether employees are similarly situated ordinarily is a question of fact, but a district court may "properly grant summary judgment where it is clear that no reasonable jury could find the similarly situated prong met." *Harlen Assocs. v. Inc. Vill. Of Mineola*, 273 F.3d 494, 499 n.2 (2d Cir. 2001.)

As an initial matter, Plaintiff's disparate treatment argument is built on the mistaken premise that the only managers in his district disciplined during his employment were himself, age 63 when he was terminated, Sam Nizami, age 56, and Andrea McNeish, age 43. (*See* Pl.'s Opp'n at 20-21.) However, the record establishes that Defendants demoted or terminated other store managers during Plaintiff's employment, including one who, at 41 years old, was hardly older than Mr. Thom. (*See* Connell Decl. ¶¶ 26, 30; Ex. V to the Kessleman Decl; *see also* Defs.' 56.1 ¶ 188; Pl.'s 56.1 Resp. ¶¶ 188.)

In any event, Plaintiff's disparate treatment argument is unavailing because he cannot show that he was similarly situated to Mr. Imerukaj or Mr. Thom. It is well-settled that "[w]here the claim of disparate treatment is based on inconsistent disciplinary practices, a plaintiff is required to show that similarly situated employees who went undisciplined engaged in comparable conduct." *Albury v. J.P. Morgan Chase*, 2005 WL 746440, at *9 (S.D.N.Y. Mar. 31, 2005) (quoting *Graham v. Long Island R.R.*, 230 F.3d 34, 40 (2d Cir. 2000)) (internal quotation marks omitted). Here, Plaintiff concedes that the payroll misconduct at his Store, involving his employees' intentional manipulation of payroll submissions Plaintiff failed to properly review, was a "performance deficiency unique to [his own case]." (*See* Pl.s Opp'n at 19.) Given that unique deficiency, which is not reflected in the performance records of Mr. Imerukaj or Mr. Thom, Plaintiff cannot establish that he was similarly situated to those two individuals. *See Shumway*, 118 F.3d at 64 (similarly situated prong not met where plaintiff's violation of company policy was more serious than other employees' violations); *LeBlanc v. United Parcel Serv.*, 2014 WL 1407706, at *12 (S.D.N.Y. Apr. 11, 2014); *Albury*, 2005 WL 746440, at *10 (plaintiff not similarly situated where her offense was "qualitatively different" than other employees' offenses); *see also Graham*, 230 F.3d at 40 (to satisfy similarly situated prong, employees must have committed offenses of "comparable seriousness.")

Evidence in the record firmly establishes that Defendants treated failures related to payroll misconduct more seriously than those deficiencies allegedly exhibited by Mr. Imerukaj and Mr. Thom, such as missing sales targets or exceeding the expected shrink rate. In his declaration, Mr. Connell attested that payroll misconduct was considered a very serious offense that could result in immediate termination, an assertion unrefuted except by Plaintiff's conclusory allegation that there is no other evidence to support Mr. Connell's claim. (*See*

Connell Decl. ¶ 21; Defs.' 56.1 ¶ 156; Pl.'s 56.1 Resp. ¶ 156.)  However, Plaintiff's Termination Notice expressly identified payroll misconduct as a basis for his discharge, and the only other manager in the district responsible for payroll misconduct during the same timeframe as Plaintiff similarly was terminated.  (Connell Decl. ¶ 26; Defs.' 56.1 ¶ 189; Pl.'s 56.1 Resp. ¶ 189.) Plaintiff argues that a distinction must be drawn between his failure to oversee payroll activities properly, and the conduct of that other manager, who directly participated in manipulating payroll.  (*See* Pl.'s 56.1 Resp. ¶ 189.)  Nevertheless, it is not Defendants' burden to show that Plaintiff was similarly situated to that other manager, but rather Plaintiff's burden to show that he was similarly situated in all material respects to Mr. Imerukaj and Mr. Thom.  No rational trier of fact could find that he adequately has done so.

Two other factors further compel the conclusion that Plaintiff fails to establish that he was similarly situated to Mr. Imerukaj and Mr. Thom.  First, Plaintiff cherry-picks a small handful of discrete data points concerning Mr. Imerukaj's and Mr. Thom's job performance to argue, in a vacuum, that those results warranted the same discipline he received.  However, much of the data Plaintiff relies upon does not stand up to even the slightest scrutiny.  For example, Plaintiff contends that Mr. Imerukaj was not disciplined in FY 2011 despite a shrink rate, shoe damages, and payroll overages at store 497 comparable to those at Plaintiff's Store.  (*See* Pl.'s Opp'n at 18.)  The record nevertheless is clear that Mr. Imerukaj served as manager of store 497 for less than one month in FY 2011.  (S*ee* Pl.'s 56.1 Resp. ¶¶ 289-90, 292; Defs.' 56.1 Resp. ¶¶ 289-90, 292; *see also* Ex. V to the Kessleman Decl.)  Similarly, Plaintiff emphasizes the fact that Mr. Thom, his replacement, was not disciplined in FY 2012 for a significant increase in controllable expense variance at Store 694.  (*See* Pl.'s 56.1 Resp. ¶¶ 316-17; Defs.' 56.1 Resp. ¶¶ 316-17.)  However, Plaintiff omits other critical data concerning Mr. Thom's performance, such

as the fact that Mr. Thom drastically reduced the shrink rate at Store 694 in FY 2012, something Plaintiff never accomplished as manager. (*See* Defs.' 56.1 ¶ 149; Pl.'s 56.1 Resp. ¶ 149; *see also* Connell Decl. ¶ 29 with Ex. E.)

Second, Plaintiff's focus on isolated performance metrics to argue disparate treatment is misplaced, as Plaintiff was not disciplined or terminated solely on the basis of such metrics. Plaintiff's track record included failing several audits, repeatedly failing to eliminate deficiencies he was instructed to correct, and failing to satisfy objectives set forth in action plans he personally drafted. While Plaintiff is not required to show that Mr. Imerukaj and Mr. Thom had performance records identical to his, Plaintiff falls far short of demonstrating that either individual had a record of sustained underperformance comparable to his.[16] *See Varughese v. Mount Sinai Med. Ctr.*, 2015 WL 1499618, at *57-58 (S.D.N.Y. Mar. 27, 2015) (granting summary judgment where plaintiff, arguing disparate treatment, pointed to other employees who engaged in "bad acts" or had "bad weeks," but was unable to show that "anyone else had her lengthy record of persistently bad behavior.")

In sum, this Court comprehensively has reviewed the evidence in the record, which demonstrates, as Plaintiff concedes, that Defendants had a legitimate, non-discrimnatory reason for terminating him based on his underperformance. While Plaintiff does not agree that Defendants' assessments of him accurately captured his performance as a manager, Plaintiff fails to supply sufficient evidence to support a finding by a rational trier of fact that Defendants' non-discriminatory reason for terminating him was pretextual. Accordingly, Defendants are entitled

---

[16] Plaintiff argues that Mr. Imerukaj had a lengthy record of underperformance when his performance in a prior role as assistant manager is considered. However, for purposes of showing that he was similarly situated to Mr. Imerukaj, Plaintiff cannot rely on Mr. Imerukaj's performance in a different role, at a different time, with different responsibilities. *See Tunnell v. United Techs. Corp.*, 54 F. Supp. 2d 136, 140 (D. Conn. 1999), *aff'd* 216 F.3d 1073 (2d Cir. 2000) (plaintiff failed to show he was similarly situated with individual where they had "different supervisors, different positions, different pay grades and much different levels of experience.")

to summary judgment dismissing Plaintiff's ADEA claim.

## III. Application of the Mixed Motive Analysis

"In the 'mixed motive' context . . . the question on summary judgment is whether there exist triable issues of fact that discrimination was one of the motivating factors for the defendant's conduct." *Williams v. New York City Housing Auth.*, 61 A.D.3d 62, 78 n.27 (1st Dep't 2009). As the Second Circuit cautioned in *Mihalik v. Credit Agricole Cheuvreux North America, Inc.*, summary judgment is appropriate in NYCHRL cases "only if the record establishes as a matter of law that a reasonable jury could not find the employer liable under any theory." 715 F.3d 102, 113 (2d Cir. 2013). Nevertheless, although a claim under the NYCHRL is reviewed "independently from and more liberally than federal or state discrimination claims, it still requires a showing of some evidence from which discrimination can be inferred." *Ben-Levy v. Bloomberg L.P.*, 518 F. App'x 17, 19-20 (2d Cir. 2013) (quoting *Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 278 (2d Cir. 2009)).

The Court concludes that Plaintiff has not met his burden to produce such evidence, whereas Defendants have come forward with evidence conclusively establishing that their reason for terminating Plaintiff was legitimate and non-discriminatory. That conclusion is not altered by the Court's finding that Plaintiff sufficiently made out a *prima facie* case of discrimination. *See Melman*, 98 A.D.3d at 131 ("[N]ot every plaintiff asserting a discrimination claim will be entitled to reach a jury."); *see also Ben-Levy*, 518 F. App'x at 19-20. The record reflects that Plaintiff, against a background of thoroughly documented performance deficiencies and his own admissions of his underperformance, at most can attempt to support his claim of discrimination with evidence that: (1) Ms. Jean-Francois made a stray and facially neutral remark that he looked "burned out," though the remark lacked any demonstrated nexus to Plaintiff's termination; (2)

Ms. Jean-Francois may have "forced" out two other older store managers and replaced them with younger workers, although the age demographics at the management level made it highly probable that any personnel change would involve an older manager being replaced by a younger employee; and (3) Mr. Imerukaj and Mr. Thom were not disciplined in the same manner as Plaintiff, although neither of them had performance records which reflected any failure related to payroll misconduct.

The Court's previous discussion of the record suffices to establish that such evidence could not support a conclusion by a rational trier of fact that discrimination was a motivating factor in Defendants' decision to terminate Plaintiff.  *See Melman*, 98 A.D.3d at 125-28 (holding that, in light of strong evidence of legitimate, non-discriminatory reason for employment action, plaintiff's showing of stray remarks was insufficient to defeat summary judgment); *see also Holleman v. Art Crafting, Inc.*, 2014 WL 4907732, at *22-23, 30-34 (E.D.N.Y. Sept. 30, 2014) (summary judgment dismissing NYCHRL claim where plaintiff's evidence of 12 purported comparators was legally insufficient to support claim of disparate treatment); *LeBlanc*, 2014 WL 1407706, at *17 (summary judgment dismissing NYCHRL claim where plaintiff "failed to establish that his termination was mere pretext; that similarly situated employees were treated differently; or that discrimination played any role in his termination.")  Accordingly, Plaintiff's NYCHRL claim also is dismissed.

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is granted and this

action is dismissed in its entirety, with prejudice.

SO ORDERED.

Dated:  Brooklyn, New York
        September 30, 2015

_____/s/_____
DORA L. IRIZARRY
United States District Judge